**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Armando A. Marroquin,<br><br>               Plaintiff,<br><br>v.<br><br>Yolanda Fernandez-Carr, et al.,<br><br>               Defendants. | No. CV16-01667-PHX-DGC (BSB)<br><br><br>**ORDER** |

Plaintiff Armando A. Marroquin brought this civil rights action pursuant to 42 U.S.C. § 1983. Doc. 14. Defendants move for summary judgment. The Court provided notice to Plaintiff of the response requirements pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc). Doc. 80. The motion is fully briefed (Docs. 78, 85) and no party requests oral argument. For the following reasons, the Court will grant Defendants' motion in part.

## I. Background.

Plaintiff's claims arose while he was confined at CoreCivic's La Palma Correctional Center ("LPCC") in Eloy, Arizona, pursuant to a contract between the California Department of Corrections and Rehabilitation ("CDCR") and CoreCivic. Doc. 14 at 1.[1] In his six-count Second Amended Complaint, Plaintiff brought claims against the following LPCC employees: Law Library Supervisor and Education Principal Yolanda Fernandez-

---

[1] *See* CoreCivic, La Palma Correctional Center, http://www.corecivic.com/facilities/la-palma-correctional-center (last visited Feb. 15, 2019).

Carr, Law Library and Education Supervisor Kyle Prince, Case Manager Cosby, Correctional Counselor P. Kelly, Health Services Administrator ("HSA") E. Burnett, and Doctor P. Matranga. Doc. 14 at 1-3.[2]

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff asserted First Amendment access-to-courts claims against Defendants Fernandez-Carr and Prince in Counts 1 and 2, respectively; Eighth Amendment medical care claims against Defendants Burnett and Matranga in Counts 3 and 4, respectively; and First Amendment retaliation and Eighth Amendment conditions of confinement claims against both Defendants Cosby and Kelly in Counts 5 and 6, respectively. Doc. 16 at 3-6. The Court directed Defendants to answer. *Id.* Dr. James Giovino was later substituted for Defendant Matranga. Doc. 36. Defendants move for summary judgment on all claims. Doc. 78.

## II.     Summary Judgment Standard and Plaintiff's Motion.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] Citations to the docket in this order are to page numbers attached to the top of each page by the Court's electronic filing system, not to page numbers in the original documents.

Local Rule of Civil Procedure 56.1 requires a party opposing summary judgment to submit a statement of facts citing "a specific admissible portion of the record where the fact finds support." LRCiv 56.1(b). "General references without page or line numbers are not sufficiently specific." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). As the Ninth Circuit has noted, a district court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (the district court has no responsibility on summary judgment to "scour the record in search of a genuine issue of triable fact"); *see also Independent Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

In opposition to Defendants' motion, Plaintiff attached to his Statement of Facts ten exhibits totaling 124 pages, referring only to exhibits without specific page or line citations. Doc. 85. Plaintiff's wholesale citation to documents without identifying the relevant portions is inadequate. The Court has nonetheless conducted a general review of Plaintiff's exhibits and will consider that evidence to the extent that he cites specific portions within his exhibits. But the Court will not consider any asserted fact if the supporting evidence is not readily found.

## III. Counts 1 and 2: Access to Courts.

### A. Legal Standard.

Penal institutions may not actively interfere with inmates' attempts to prepare or file legal documents, and must provide prisoners "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *see also Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). The right of access to the courts is only a right to bring petitions or complaints to federal court and not a right to discover such claims or litigate effectively once filed. *Lewis*, 518 U.S. at 354. The right "guarantees no particular methodology but rather [confers] the capability [to challenge] sentences or conditions of confinement before the courts." *Id.* at 356.

To succeed on a "backward-looking" access claim, a plaintiff must show: "(1) the loss of a non-frivolous or arguable underlying claim; (2) the official acts that frustrated the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit." *Arellano v. Blahnik*, No.: 16-cv-2412-CAB (DHB), 2017 WL 2833117, at *8 (S.D. Cal. June 30, 2017) (discussing *Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002)). The first element "is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. The right of access "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Id*. at 355. The nonfrivolous claim must be a direct or collateral attack on the inmate's sentence or a challenge to his confinement conditions. *Id*. "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id*. (emphasis in original); *see also Hebbe*, 627 F.3d at 342-43 (prisons must provide the "tools" that "inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement").

## B. Relevant Facts.

Counts 1 and 2 allege that on thirteen days between May 25, 2011, and January 31, 2015, Defendants Fernandez-Carr and Prince instructed their subordinates to deny Plaintiff's requests for photocopies of his legal paperwork, resulting in the dismissal of his criminal and civil cases in June 2011, September 2012, January 2015, October and November 2014, and January 2015. Doc. 14 at 4, 6.[3] Plaintiff also alleges that Defendants denied him access to Spanish-language books, case law, and legal data that were necessary to prepare his habeas corpus petition. *Id.* at 5, 7.

Fernandez-Carr is the Principal of the Education Department at the LPCC and is responsible for overseeing the education program there, including at the facility's two libraries. Doc. 79 (Defs. Statement of Facts ¶¶ 2-3). When Plaintiff's claims arose, Prince

---

[3] Plaintiff states that the denials took place on May 25, 2011; September 13, 16, and 18, 2012; March 6, 2013; October 9 and 28, 2014; November 11, 2014; and January 3, 17, 23, 29, and 31, 2015. Doc. 14 at 4, 6.

was an LPCC Instructor Supervisor and responsible for supervising LPCC teachers under the direction of Fernandez-Carr.  *Id.* ¶¶ 4-5.  Plaintiff was assigned to the LPCC education program from May 9, 2011 to July 8, 2015.  *Id.* ¶ 8.  Plaintiff was paid $0.25 per hour to attend class, and his wages were deposited monthly into his inmate trust account.  *Id.* ¶ 9.

Pursuant to Title 15 of the California Code of Regulations ("CCR") – which governs the rules and regulations for CDCR facilities – legal photocopying services may be provided without charge to unrepresented indigent inmates.  *Id.* at ¶ 11 (citing 15 CCR § 3162).  An indigent inmate is one "who currently has, and for the previous 30 consecutive days has maintained, $1.00 or less in his inmate trust account."  *Id.* ¶ 12 (citing 15 CCR § 3162(a)).  All other inmates must pay for photocopying services.  *Id.* ¶ 16 (citing 15 CCR § 3162(b)).  Photocopies of legal documents are "limited to the maximum number of pages needed for the filing, not to exceed 50 pages in total length, except when necessary to advance litigation."  *Id.* ¶ 19 (quoting 15 CCR § 3162(c)).

Under the LPCC Printing and Duplication Procedure, "[r]equests for duplication of documents exceeding 50 pages in length shall be granted when accompanied by a reasonable written explanation of the need."  *Id.* ¶ 20.  But "[i]n no event shall staff be required to duplicate legal documents exceeding 100 pages in length without a court order directing the duplication to take place."  *Id.*  If a non-indigent LPCC inmate has insufficient funds in his inmate trust account to pay for photocopies, or the request exceeds 50 pages, law library staff must deny the request and forward it to the Assistant Warden for approval.  *Id.* ¶ 22.  The Assistant Warden always authorizes photocopies for legal forms and documents, even if the inmate has a zero balance in his trust account.  In such a case, the requested copies are made, and a hold is placed on the inmate's account for the unpaid balance.  *Id.* ¶¶ 24-25.  For indigent inmates, the charges expire unless the inmate is removed from indigent status within 30 days of incurring the charges.  For non-indigent inmates, the hold remains until the balance is paid or the inmate is transferred to a non-CoreCivic facility.  *Id.* ¶¶ 14-15, 25-26.  Around 2010 or 2011, Plaintiff had a hold on his

account for approximately $400 due to making previous photocopies without sufficient funds in his trust account. *Id.* ¶ 33; *see* Doc. 79-3 (Pl. Depo.) at 18:17-19:12.

During his deposition, Plaintiff was asked about each of the dates on which he asserts Defendants denied his requests for photocopies and Spanish-language legal materials. Doc. 79-3 at 25:7-51:5. For each date, Plaintiff could not recall what documents he attempted to photocopy or in which cases or courts those documents were filed. *Id.* Plaintiff testified that when he asked library staff for photocopies, the staff members would call their "boss," who would deny the request telephonically. *Id.* Plaintiff did not personally participate in the phone calls and assumed that the "boss" was either Fernandez-Carr or Prince, but he did not know which Defendant denied his requests. *Id.* When asked what specific Spanish-language materials he requested, Plaintiff responded: "[b]ooks and – legal books in Spanish and Spanish/English dictionaries." *Id.* at 47:24-48:2.

**C.  Discussion.**

Plaintiff asserts that Defendants denied his requests for photocopies, case law, Spanish-language books, and other legal data. Doc. 16 at 3. His response cites a declaration by a fellow inmate and pages of an education progress report, but neither exhibit appears to describe Defendants' denial of Plaintiff's requests. Docs. 85 at 4; 85-3 at 12. Indeed, around 2010 or 2011, Plaintiff had a hold on his account for about $400 from being permitted to make photocopies without sufficient funds. Plaintiff's response does not rebut this or Defendants' other asserted facts. *See* Doc. 85 at 3. Plaintiff refers to his exhibits A and B without specific citations. *Id.* These exhibits include over 60 pages, many of which are illegible, and Plaintiff offers no explanation of their relevance to his claims. Docs. 85-1 at 2-38; 85-2 at 1-18; 85-3 at 1-10. Plaintiff identifies no other evidence of Defendants' alleged actions which frustrated the litigation of his underlying claims. *See Harbury*, 536 U.S. at 415.

Plaintiff also fails to "identify a nonfrivolous, arguable underlying claim" that he lost because of Defendants' actions. *Id.* (internal quotations omitted). Plaintiff fails to identify the underlying cases at issue, in which courts they were pending, what documents

he was unable to file, and the consequences in each case. Doc. 79-3 at 8-21, 24-34. His response discusses no underlying actions giving rise to his current access claims, making impossible the Court's task of determining whether his "claim for relief underlying the access-to-courts plea" is nonfrivolous and arguable, *Harbury*, 536 U.S. at 417, and what remedy "may be awarded as recompense but that is not otherwise available in a future suit" *Arellano*, 2017 WL 2833117, at *8. *See* Doc. 85.

Plaintiff fails to establish elements essential to his access-to-courts claims. *See Celotex*, 477 U.S. at 323. The Court will grant Defendants' motion on Counts 1 and 2.

**IV.     Counts 3 and 4: Medical Care.**

**A.     Legal Standard.**

To state a § 1983 claim based on prison medical treatment, a plaintiff must show (1) a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," and that (2) "the defendant's response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (internal quotations omitted). The requirement of deliberate indifference "is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'" *Id.* (citations omitted); *Estelle*, 429 U.S. at 104-05.

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). A prison official must both know of and disregard an excessive risk to inmate health – he must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A plaintiff must show more than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835; *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (indifference, negligence, or medical

malpractice are insufficient under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Nor is mere delay in medical care, without more, sufficient to state a claim against prison officials. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

### B. Relevant Facts.

#### 1. Defendant Burnett.

Count 3 alleges that Defendant Burnett was deliberately indifferent in failing to provide Plaintiff with adequate pain medication for his back and head pain, refusing to order his prescribed orthopedic shoes, and failing to treat his testicular tumor. Docs. 14 at 8-9; 16 at 4. Burnett's HSA responsibilities included overseeing "the administrative aspects of the medical unit, [and] ensuring that medical staff and inmates complied with CoreCivic policy regarding the provision of medical care." Doc. 79-4 (Burnett Decl.) ¶ 3. He asserts that he did not perform any clinical duties or have authority to prescribe or cancel medications, prescribe courses of treatment, or order orthopedic shoes. *Id.* ¶¶ 3, 5. He was not a licensed independent provider, and his HSA duties were "purely administrative." *Id.* ¶ 5. He asserts that orthopedic shoes could be ordered and approved only by licensed independent providers. *Id.* ¶¶ 6-7.

Burnett also acted as the medical grievance officer and was responsible for responding to first-level inmate medical grievances. *Id.* ¶ 8. He stated that:

> When a grievance complained that a medication was improperly cancelled, I would first review the file to locate the cancellation and the reason for it. If I could not find a documented reason for the cancellation, I would speak to the physician or other licensed independent provider who gave the order in order to provide the inmate with an explanation as to why the medication was cancelled. If the reason was documented in the file, I would cite that reason in the grievance response and support the provider's conclusion.

*Id.* ¶ 9.

On February 4, 2014, Burnett denied Plaintiff's first-level medical grievance in which Plaintiff requested Baclofen. *Id.* ¶ 10. Burnett advised Plaintiff that only licensed

- 8 -

independent providers could prescribe medication and that Plaintiff should use the sick call process to seek treatment from his licensed independent provider. *Id.* On October 8, 2014, Burnett denied another first-level medical grievance in which Plaintiff demanded $500,000 for surgeries, medications, and supplies. *Id.* ¶¶ 123, 124. He advised Plaintiff that there was no mention of testicular swelling during Plaintiff's May 28, 2014 appointment with the licensed independent provider, and that the provider had determined orthopedic shoes were not medically necessary. *Id.* ¶ 124.

### 2. Defendant Giovino.

Count 4 alleges that Defendant Giovino was deliberately indifferent in failing to provide Plaintiff with adequate pain medication for back pain, cancelling his pain and most other medications without notification, and failing to treat his tumor. Docs. 14 at 10-11; 16 at 4-5. Giovino was a licensed physician employed at LPCC. Doc. 79 at 15 ¶¶ 130, 132.

On March 31, 2014, Plaintiff requested a renewal of his prescription for dandruff shampoo. *Id.* ¶ 135. Giovino reviewed Plaintiff's medical file, noted Plaintiff's seborrheic dermatitis of the scalp diagnosis, and renewed Plaintiff's dandruff shampoo prescription, but did not see Plaintiff in person that day. *Id.* ¶¶ 132, 135.

On May 25, 2014, Plaintiff submitted a sick call request for his "chronos" and medication to be updated, and complained that his "right testicle [was] getting big and [in] pain." Doc. 85-4 at 23 (Pl.'s Ex. G). A "chrono" is a written document that informs LPCC staff of accommodations necessary for an inmate with the issued chrono. Doc. 79 at 17 n.3. A nursing staff member reviewed the sick call request and scheduled an appointment. Doc. 85-4 at 23. On May 28, 2014, Giovino saw Plaintiff for constipation; hemorrhoids; non-compliance with his medications; seborrheic dermatitis of the scalp; gastroesophageal reflux disease (GERD); chronic lower back, upper back, and left knee pain; and frontal headaches. *Id.*; Doc. 79 ¶¶ 137, 145. Giovino ordered prescriptions for Miralax; hemorrhoidal suppositories; acetaminophen 500mg; medicated shampoo; Omeprazole; and a one-year chrono for arch supports, bottom bunk/bottom tier, and left knee sleeve. Doc. 79-5 (Giovino Decl., Ex. B) at 11-12. He noted that Plaintiff had previously "refused

nortriptyline, and again state[d] he d[id] not want any med[ications that] he ha[d] to take daily, and stand in line for." *Id.* at 11.

Giovino noted that Plaintiff had flat feet, but found "[n]o medical necessity" for orthopedic shoes. *Id.* at 12; Doc. 79 ¶ 150. He concluded that Plaintiff needed only soft shoes and arch support insoles, and denied Plaintiff's orthopedic shoes request. *Id.* at 12; Doc. 79 ¶ 151. Giovino also denied Plaintiff's request for Baclofen for back pain. Doc. 79 ¶ 154. Plaintiff had been prescribed Baclofen – a muscle relaxer – from April 8 to October 5, 2013. Docs. 85-4 (Pl.'s Ex. E); 79 ¶ 154. But Giovino determined Baclofen was inappropriate for Plaintiff at that time, noting that it "is not indicated for long term use, [and] is potentially addictive." *Id.* ¶ 13; Doc. 79-5 at 12.

Plaintiff reported no issues with his right testicle during the May 28, 2014 appointment. Giovino had no further involvement in Plaintiff's medical treatment. Docs. 79 ¶¶ 132, 138; *see* 79-5 at 10-12.

**C. Discussion.**

Burnett's responses to Plaintiff's medical grievances on February 4 and October 8, 2014 do not amount to deliberate indifference. Burnett investigated Plaintiff's grievances, reviewed his medical records, interviewed him, and then deferred to the medical staff's professional judgment. *See* Doc. 79-4 at 7-11 (Burnett Decl., Exs. A and B). Burnett's duties were administrative; he had no authority to prescribe medications or treatment. *See Peralta v. Dillard*, 744 F.3d 1076, 1086-87 (9th Cir. 2014) (noting that an official does not violate the Eight Amendment when he has no actual knowledge of risk, even severe risk, where official understood his role to be administrative, did not believe he was required to interview prisoners, review medical records, or second-guess staff dentists' diagnoses). Plaintiff cites his Exhibit E, which he asserts "clearly shows that Burnett was who denied everything." Doc. 85 at 5. Exhibit E contains several documents, some without Burnett's signature, some illegible. Docs. 85-3 at 21-28; 85-4 at 1-15. Plaintiff offers no further explanation or evidence that Burnett knew of and disregarded an excessive risk to his health. *See Farmer*, 511 U.S. at 837; Doc. 85 at 5. And Plaintiff's mere disagreement with

the grievance responses is insufficient to support a medical deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Defendant Giovino's actions during the May 28, 2014 appointment also do not constitute deliberate indifference. Giovino responded to Plaintiff's complaints during the appointment, including prescribing him several medications and arch support insoles. Doc. 79-5 at 10-12. Plaintiff asserts that he mentioned his testicular tumor issues to Giovino, and he did mention testicular pain and swelling in his May 25, 2014 sick call request. *See* Doc. 85-4 at 23. But no evidence shows that Giovino reviewed this sick call request, was aware of its contents, or refused to examine Plaintiff, as he asserts. Nursing staff reviewed the sick call request, but Plaintiff cites no evidence that Giovino received it. Absent evidence that Giovino was actually aware of Plaintiff's testicular issues or that Plaintiff raised them during the May 28, 2014 appointment, Giovino's failure to address his testicular tumor does not amount to deliberate indifference. *See Farmer*, 511 U.S. at 837. In support, Plaintiff cites his Exhibit G. Doc. 85 at 5 (citing Doc. 85-4 at 23-32). Many of the documents within this exhibit are in Spanish, without translation, and Plaintiff fails to identify which portion of the exhibit proves that Giovino "actually knew that his actions put [Plaintiff] at risk." *Peralta*, 744 F.3d at 1087.

Giovino's decisions to prescribe acetaminophen instead of Baclofen, and to issue arch supports instead of orthopedic shoes, do not support deliberate indifference. Giovino determined, based on his professional judgment, that Baclofen was inappropriate for Plaintiff's back pain and prescribed acetaminophen instead. Doc. 79-5 at 11-12. Likewise, he determined that arch supports would alleviate Plaintiff's mild flat feet. *Id.* Again, Plaintiff's disagreement with these assessments does not amount to deliberate indifference. *Sanchez*, 891 F.2d at 242. And no evidence shows that Giovino's responses to Plaintiff's serious medical needs were medically unacceptable or rose to "unnecessary and wanton infliction of pain." *See Estelle*, 429 U.S. at 105; *Jett*, 439 F.3d at 1096.

The Court will grant summary judgment on Counts 3 and 4 in favor of Defendants Burnett and Giovino.

**V.    Counts 5 and 6: Conditions of Confinement.**

**A.    Legal Standard.**

To succeed on an Eighth Amendment conditions-of-confinement claim, a plaintiff must satisfy a two-part test.  First, the alleged constitutional deprivation must be, objectively, sufficiently serious – the official's act or omission must deny "the minimal civilized measure of life's necessities."  *Farmer*, 511 U.S. at 834 (internal quotations omitted).  Second, the prison official must have a "sufficiently culpable state of mind," meaning that he acts with "deliberate indifference to inmate health or safety."  *Id.* (internal quotations omitted).

As in the medical context, deliberate indifference is a higher standard than negligence or lack of ordinary care, *Farmer*, 511 U.S. at 835, and requires "subjective recklessness," *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015).  That is, an "official cannot be found liable under the Cruel and Unusual Punishment Clause for denying an inmate humane conditions of confinement 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Castro v. City of L.A.*, 833 F.3d 1060, 1068 (9th Cir. 2016) (quoting *Farmer*, 511 U.S. at 837).  "[T]he official must demonstrate a subjective awareness of the risk of harm," and there must be no reasonable justification for the deprivation.  *Id.* at 837, 844.

**B.    Relevant Facts.**

Plaintiff asserts that between January and August, 2014, Defendants Cosby and Kelly violated his Eighth Amendment rights by denying him indigent and non-indigent supplies, including pre-stamped envelopes, lined paper, toilet paper, disinfectant, shampoo, soap, deodorant, and any means to clean the cell floor, sink, and toilet.  Docs. 14 at 12-15; 16 at 5.

Defendant Cosby was the Unit Manager of the LPCC Pima unit from April 2013 to March 2014. Doc. 79-6 (Cosby Decl.) ¶ 5.[4] As Unit Manager, he "was responsible for the wellbeing of the inmates in [the] unit" including "ensuring that the inmates received the hygiene and other supplies they were entitled to pursuant to CDCR regulations." *Id.* ¶ 7. Defendant Kelly was a Corrections Counselor at the LPCC Pima Unit from January 15 to July 10, 2014, and was responsible for ensuring inmates received the supplies they were entitled to. Doc. 79-7 (Kelly Decl.) ¶¶ 4-5.

Pursuant to the CDCR policy, "[a]ll inmates were provided weekly rations of basic hygiene supplies, including soap, razors, and toilet paper." Doc. 79-6 ¶ 8. Indigent inmates were provided weekly rations of items such as shampoo, deodorant, and toothpaste, and would receive packets containing paper, pens, and envelopes upon request. *Id.* ¶ 8. Non-indigent inmates purchased these items from the canteen. *Id.* Cell-cleaning supplies were not provided to inmates on an individual basis, and were kept in a locked closet in each housing pod. Inmates were permitted to use these supplies to clean their cells after the pod porters cleaned the common areas of the pod. *Id.* ¶ 14.

Defendants Cosby and Kelly assert that they never denied Plaintiff basic hygiene supplies given to all inmates. *Id.* ¶ 11; Doc. 79-7 ¶ 9. They also assert that although Plaintiff often had a zero balance in his trust account despite receiving monthly deposits from his job, they still provided him with indigent supplies whenever extras were available. Docs. 79-6 ¶ 13; 79-7 ¶ 11.

**C.    Discussion.**

**1.    Indigency.**

Plaintiff asserts a deprivation of both indigent and non-indigent supplies, but Defendants dispute that Plaintiff was indigent during the period of alleged violations. They cite the applicable CCR regulations, which provide that to be indigent, an inmate must have a balance of less than $1.00 in his inmate trust account for 30 days or more. Doc. 79 at 20

---

[4] In March 2014, Defendant Cosby moved to the LPCC Hopi Unit as the Unit Manager. Doc. 79-6 ¶ 6.

(citing Doc. 79-6 at 4). Plaintiff cites his Exhibit A, which includes the CDCR's first, second, and third level decisions reviewing his grievance and grievance appeals seeking indigent supplies. *See* Doc. 85-1 at 1-14. At the first level review, Plaintiff was found not indigent. *Id.* at 10. But the second level review found that Plaintiff was indigent and entitled to indigent supplies so long as he had an account hold which effectively precluded him from purchasing canteen items. *Id.* at 6. The reviewer reasoned that although Plaintiff received deposits into his trust account, LPCC would immediately withdraw the funds to apply to his account balance, leaving him without the ability to purchase canteen items and effectively indigent. *Id.* at 2. The third level review denied Plaintiff's appeal, but did not reverse the indigency finding. *Id.*

Defendants' motion does not address the CDCR's indigency finding or otherwise argue why the Court should diverge from CDCR's interpretation.[5] Doc. 78 at 5-6.

### 2. Conditions-of-Confinement Claim.

"[T]he Eight Amendment guarantees sanitation . . . and personal hygiene," including the right to supplies such as soap and toothbrushes. *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (citing cases). "[L]ack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment." *Xai Xiong v. Kirland*, No. CIV S-09-3345 MCE GGH P, 2012 WL 260006, at *11-*12 (E.D. Cal. Jan. 25, 2012) (citing *Johnson v. Lewis*, 217 F.3d 726, 732-33 (9th Cir. 2000)). "Prisoners may [also] be entitled to appropriate materials to clean their cells depending on the overall squalor of the institution." *Walker v. Ahern*, No. 16-cv-04988-YGR (PR), 2018 WL 2267745, at *10 (N.D. Cal. May 17, 2018) (citing *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985)). "The circumstances, nature, and duration of a deprivation of [] necessities must be considered in determining whether a constitutional violation has occurred." *Hernandez v. Schriro*, No. CV 08-0245-PHX-MHM, 2008 WL 1774132, at *5 (D. Ariz.

---

[5] Defendants cite a docket number in another action, but do not provide a citation to that document in this record. Doc. 79-6 at 4.

Apr. 15, 2008) (quoting *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005)) (internal quotations omitted).

Under the first step of his conditions-of-confinement claim, Plaintiff asserts a "sufficiently serious" constitutional violation by Defendants Cosby and Kelly that denied him "the minimal civilized measure of life's necessities" – deprivation of his hygiene and cell-cleaning supplies for six months. *See Keenan*, 83 F.3d at 1091; *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (citing *Farmer*, 511 U.S. at 834). Defendants deny refusing Plaintiff's requests for indigent hygiene supplies, and they assert he had access to cleaning materials. Doc. 78 at 16. But a dispute of fact exists regarding whether Plaintiff received these supplies during the six-month period. Both parties cite to CDCR's third level appeal decision, wherein the reviewer cited evidence that Plaintiff received indigent supplies and Plaintiff continued to assert that he did not. Doc. 85-1 at 2. Like his verified Second Amended Complaint, Plaintiff's response maintains that he did not receive indigent and cleaning supplies during this period. Docs. 85 at 6; 14. *See Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1022 (9th Cir. 2010) ("a verified complaint may serve as an affidavit for purposes of summary judgment if it is based on personal knowledge and sets forth the requisite facts with specificity"). Thus, the parties' arguments can be resolved only through credibility determinations, which the Court cannot make at the summary judgment stage. *Anderson*, 477 U.S. at 249.

Under the second step, Plaintiff must show Defendants' deliberate indifference – their awareness and disregard of a risk to his health or safety without reasonable justification. Defendants argue that no evidence shows that Plaintiff suffered an actual injury from being denied indigent supplies. Doc. 78 at 16. But "Eighth Amendment conditions-of-confinement claims are not dependent [on] actual harm coming to fruition; it is the exposure to a *risk* of substantial harm that is of consequence." *Frierson v. Ojeda*, No. 1:14-CV-00553-LJO-SKO (PC), 2015 WL 5813440, at *3 (E.D. Cal. Sept. 30, 2015) (citing *Parsons v. Ryan*, 754 F.3d 657, 676-77 (9th Cir. 2014)). "Although [Plaintiff] is required to show awareness of the risk, 'a factfinder may conclude that a prison official

knew of a substantial risk from the very fact that the risk was obvious.'" *Foster*, 554 F.3d at 814 (quoting *Farmer*, 511 U.S. at 842). "[I]f an inmate presents evidence of very obvious and blatant circumstances indicating that the prison official knew the risk existed, then it is proper to infer that the official must have known [of the risk]." *Id.* (citation omitted).

In his verified Second Amended Complaint, Plaintiff states that Defendants "subjected [him] to [a] prolonged period of [inhumane] condition[s] of confinement and a substantial risk of serious harm and [physical], psychological, and emotional torture for a period of six months." Doc. 14 at 12, 14. Plaintiff alleges that during those six months he was denied toilet paper, disinfectant, shampoo, soap, deodorant, and other cleaning supplies. Construing the facts in Plaintiff's favor, a genuine dispute of material fact exists regarding whether he was denied personal hygiene and cleaning supplies without reasonable justification, causing him physical, psychological, and emotional harm. *See Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (finding dispute of material fact in medical care claim where medical records showed prisoner lost nine pounds, but prisoner's affidavit stated 22 pounds and prisoner's verified complaint asserted his doctor told him that he had improper nutrition). A jury could resolve the dispute in Plaintiff's favor and conclude that the deprivation of essential hygiene and cleaning supplies – toilet paper, disinfectant, shampoo, soap, deodorant, and means to clean his cell – constituted an obvious risk to Plaintiff's health and safety of which Defendants were aware. *See Foster*, 554 F.3d at 814; *Harrington*, 785 F.3d at 1304 ("obviousness of a risk may be used to prove subjective knowledge"); *Thomas v. Ponder*, 611 F.3d 1144, 1152 (9th Cir. 2010); *Xai Xiong*, 2012 WL 260006, at *11-12 (recommending denial of summary judgment where Plaintiff asserted he was deprived bedding for a week, given dirty clothes, not allowed to exchange laundry, and denied showers for five months, adopted in full by district court).

A dispute of material fact precludes summary judgment with respect to Plaintiff's claimed deprivation, and could be resolved in Plaintiff's favor under the second prong.[6] The Court will deny Defendants' motion as to this part of Plaintiff's claim.

As to the portion of Plaintiff's conditions-of-confinement claim asserting Defendants' failure to provide him with paper, envelopes, and writing utensils, insufficient evidence shows that these deprivations created a significant risk of serious harm to Plaintiff's health and safety. *See Wright v. Rushen*, 642 F.2d 1129, 1132 (9th Cir. 1981) ("An institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety") (citation omitted). Nor does Plaintiff show that the deprivation of paper and writing utensils presented an obvious risk supporting a finding of Defendants' deliberate indifference. The Court will grant summary judgment in favor of Defendants Cosby and Kelly on this part of Plaintiff's conditions-of-confinement claim.

## VI. Counts 5 and 6: Retaliation.

### A. Legal Standard.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendant's conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

/ / /

---

[6] Defendants assert that Cosby was transferred to a different unit in March 2014 and that he therefore could not have denied Plaintiff supplies after that point. Doc. 78 at 16. Plaintiff's response and citation to Cosby's declaration are unclear. In any event, Plaintiff asserts Cosby's deprivations began in January 2014, and Cosby does not dispute that he worked Plaintiff's unit in January and February. *See* Doc. 79-6 at 3.

### B.    Relevant Facts.

In Counts 5 and 6, Plaintiff asserts that Defendants Cosby and Kelly retaliated against him for filing grievances and threatening to file a lawsuit related to the denial of indigent supplies.  Doc. 14 at 12-15.  Plaintiff states that on March 18, 2014, Cosby threatened to send him to segregation if he did not stop filing grievances and asking for indigent supplies, and on August 1, 2014, Cosby had him moved to another unit.  *Id.* at 12-13.  Plaintiff also states that when he threatened to sue Kelly for denying him indigent supplies on July 10, 2014, Kelly had him moved to another unit.  *Id.* at 13.  According to Plaintiff, when he threatened to file a grievance against Kelly for moving him into a cell "with a troublemaker inmate,"[7] Kelly retaliated by searching his cell two to four times per week, confiscating legal papers and grievances that Plaintiff was preparing, and threatening to send Plaintiff to segregation.  *Id.* at 14-15.

According to Cosby, by August 1, 2014, he had moved to the Hopi Unit and was no longer the Unit Manager for Pima Unit.  (Cosby Decl. ¶ 16.)  Cosby states that once he left the Pima Unit in March 2014, he "had no control over [Plaintiff's] moves" and therefore had no authority to have Plaintiff moved to another unit on August 1, 2014.  *Id.*

Kelly asserts that he had no authority to assign Plaintiff to a cell or unit because Unit Managers made those decisions.  Kelly Decl. ¶¶ 13, 19.  On January 17, 2014, Plaintiff was moved from cell 212 to 126 "as part of unit-wide moves to make room for new intake inmates."  *Id.* ¶ 13.  According to Defendant Kelly:

> When [Plaintiff stated he did not want to be housed with the "troublemaker inmate," I conferred with the Unit Manager, who told me to tell [Plaintiff] that he would be placed in segregation for refusing housing if he did not accept the move and the cell mate.  This was not done in retaliation for anything [Plaintiff] did or said, but was standard procedure, as it was a violation of facility rules for an inmate to refuse housing.

*Id.* ¶ 14.

---

[7] To the extent Plaintiff claims that cell assignment with a "troublemaker" inmate constitutes an adverse action, insufficient facts about the inmate support such a position.

As to cell searches, Kelly asserts that it was LPCC policy for "staff [to] search three cells in each pod each shift during the first and second shifts" to prevent inmates from hiding contraband and conducting illicit and dangerous activities, and that "[a] notation was made in the unit logbook indicating which cells were searched each shift." *Id.* ¶¶ 15, 18. Kelly estimates that "[w]ith approximately 60 cells in each pod, each cell was searched two to three times per month," but provides no copy of the logbook documenting cell searches. *Id.* ¶ 16. Kelly denies searching Plaintiff's cell two to three times per week and states that during cell searches he "would thumb through inmates' legal property to make sure there was no contraband hidden inside it," but that he did not read the inmates' legal documents or confiscate them. *Id.* He also states that he once conducted a search of Plaintiff's cell and confiscated a pound of screws, copper wires, and other potentially dangerous items. *Id.* ¶ 17. Defendants deny threatening to place Plaintiff in segregation. Doc. 79 ¶¶ 180, 225.

Plaintiff testified that he "was not intimidated" and continued to file grievances after Defendants' threats to send him to segregation and his transferred to another unit. Doc. 79-3 (Pl. Depo) at 80:9-15, 88:2-7, 89:1-2.

## C. Discussion.

### 1. Protected Conduct.

Plaintiff asserts that Defendants retaliated against him for filing grievances and threatening to file a lawsuit related to the denial of indigent supplies. Doc. 14 at 12-15. It is well-settled that protected conduct in the prison context includes filing lawsuits and prison grievances. *Rhodes*, 408 F.3d at 567; *Bruce*, 351 F.3d at 1288.

### 2. Adverse Action.

Plaintiff must demonstrate that an adverse action was taken against him and identify specific facts as to each Defendant's acts or omissions that caused the deprivation. *Rhodes*, 408 F.3d at 567-68; *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). An action qualifies as an "adverse action" if it "would chill or silence a person of ordinary firmness from future First Amendment activities," *Rhodes*, 408 F.3d at 568-69, including deterring a prisoner

from "vindicating his . . . rights through the grievance process and the courts," *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004). Plaintiff asserts that Defendants threatened to send him to segregation, transferred him to another unit, conducted retaliatory searches, and confiscated his legal materials. Doc. 14 at 12-16. Construing the facts in Plaintiff's favor for purposes of summary judgment, the record supports that Defendants took adverse actions against Plaintiff.

### 3. Nexus and Legitimate Correctional Goal.

Plaintiff must demonstrate a nexus between the alleged retaliatory act and protected activity. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000). A nexus is not established simply by showing that defendant's adverse activity followed protected speech. *Huskey*, 204 F.3d at 899. "[A] plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (internal quotations and citation omitted). "To show the presence of this element on a motion for summary judgment, [Plaintiff] need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [Defendants'] intent' in issuing the warning." *Id.* (citation omitted). "[T]iming can properly be considered as circumstantial evidence of retaliatory intent." *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003) (citation omitted).

No evidence shows that Plaintiff's transfer to another unit, the searches of his cell, or alleged confiscation of his documents were motivated by a retaliatory purpose. Plaintiff asserts that on March 18, 2014, Cosby threatened to send him to segregation if he continued filing grievances and asking for indigent supplies. Doc. 14 at 12-13. But Plaintiff was not moved to another unit until August 2014, more than four months later. *Id.* Plaintiff asserts that a video exists of Cosby threatening him, and that another inmate witnessed this interaction who is willing to testify. Doc. 85 at 7-8. But Plaintiff's response includes no video or declaration with this supporting evidence. Plaintiff offers no other explanation or supporting evidence with respect to his allegations against Kelly. *See id.*

Defendants offer evidence that cell searches were routinely conducted pursuant to LPCC policy. Plaintiff cites no facts linking Kelly's searches of his cell to his protected conduct. Defendants cite evidence that Plaintiff's unit transfers were conducted pursuant to LPCC policy, and Plaintiff does not refute this with evidence of suspect timing or evidence otherwise supporting retaliatory motive.

The record lacks specific facts regarding the documents Kelly confiscated from Plaintiff or when they were confiscated. Absent such facts, insufficient evidence supports Plaintiff's claim of retaliatory motive with respect to the cell searches, the transfer, or the confiscated documents. Plaintiff also fails to refute Defendants' evidence that the unit transfer, cell searches, and resulting confiscations served a legitimate penological purpose.

### 4. Chilling Effect.

Plaintiff must show that Defendants' threats to send him to segregation would "chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim*, 584 F.3d at 1271 (citation omitted). Defendants present evidence that Plaintiff continued to file grievances after the purported threats and that he "was not intimidated" by them. Doc. 79-3 (Pl. Depo) at 80:9-15, 88:2-7, 89:1-2. They also cite evidence that the only time Plaintiff was threatened with being sent to segregation was when he attempted to refuse a housing assignment in violation of LPCC policy. (Kelly Decl. ¶ 14.)

Other than his allegations in the Second Amended Complaint, Plaintiff provides no evidence showing that Defendants' actions had a chilling effect on his First Amendment activities. *See Celotex*, 477 U.S. at 324; *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact") (citation omitted). Plaintiff does not assert that he was deterred from exercising his First Amendment rights, and he presents no evidence showing a chilling effect. To the contrary, Plaintiff testified that he "was not intimidated" and continued to file grievances after his transfers and Defendants' threats. Although "[s]peech can be chilled even when not completely silenced," *Rhodes*, 408 F.3d at 562, the Court is unable to determine whether a

person of ordinary firmness would have been chilled from pursuing future First Amendment activities on this record.

Plaintiff fails to establish essential elements of his retaliation claim – a nexus between his protected activity and Defendants' adverse action, a chilling effect, and refutation of a legitimate correctional purpose. The Court will grant summary judgment on the Counts 5 and 6 retaliation claims.

**IT IS ORDERED:**

1. That the reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 78), and the Motion is **granted in part and denied in part**. Summary judgment is denied on Counts 5 and 6 only with respect to Plaintiff's conditions-of-confinement claim asserting he was denied hygiene and cleaning supplies, but granted on Plaintiff's claim that he was denied envelopes, paper, and writing utensils. Summary judgment is granted in favor of all Defendants on all other claims.

2. Within 30 days of this order, the parties shall file five-page memoranda regarding the expected length of trial, whether a jury trial is warranted, and any other facts that will assist the Court in setting a trial date.

Dated this 4th day of March, 2019.

David G. Campbell
Senior United States District Judge